# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| HOSSEIN TAVAKOLI and POURANDOK SHAHNIAN, a married couple, and the marital community composed thereof,<br><br>       Plaintiff,<br><br>  vs.<br><br>ALLSTATE PROPERTY and CASUALTY INSURANCE COMPANY, an Illinois Company Doing Business in the State of Washington,<br><br>       Defendant. | Cause No. 2:11-cv-01587-RAJ<br><br><br>**DECLARATION OF KYLE C. OLIVE IN SUPPORT OF PLAINTIFFS' MOTIONS *IN LIMINE*** |

I, KYLE C. OLIVE, declare that the following is true and correct:

1.    I am an attorney at OLIVE|BEARB & GRELISH, PLLC, and counsel of record for Plaintiffs in the above-captioned matter. I am over the age of eighteen and competent to testify in the matters set forth below.

2.    Attached to this declaration are true and correct copies of the following:

**Exhibit 1**:    "Defendant's Disclosure of Expert Witnesses" received by my office on or about August 27, 2012, wherein Allstate discloses, for the first time, William Partin, CPA/ABV as a rebuttal expert.

**Exhibit 2**:    Report of William Partin submitted along with "Defendant's Disclosure of Expert Witnesses" on or about August 27, 2012.

DECLARATION OF KYLE C. OLIVE IN SUPPORT OF PLAINTIFFS' MOTIONS *IN LIMINE*– Page 1 of 2
**2:11-cv-01587-RAJ**

OLIVE|BEARB & GRELISH PLLC
1218 3rd Ave, Suite 1000
Seattle, WA 98101
T: (206) 629-9909
F: (206) 971-5081

1
2

**Exhibit 3**:     Curriculum Vitae of William Partin, submitted along with "Defendant's Disclosure of Expert Witnesses" on or about August 27, 2012.

3
4

**Exhibit 4**:     Report of John Fountaine, Rehabilitation Counselor, regarding Mr. Hossein Tavakoli wage earning capacity.

5

**Exhibit 5**:     Curriculum Vitae of John Fountaine

6
7

**Exhibit 6**:     "Order Granting Defendant's Motion for Trial by Jury on the Issue of Punitive Damages" issued in *Northwestern Mut. Life Ins. Co. v. Koch*, 771 F. Supp.2d 1253 (2009)

8

3.     On January 2, 2013, I held a telephone conference with Gavin Skok to discuss

9    the issues related to the parties motions in limine.  We were unable to resolve our differences

10   with regard to the issues put forward in the plaintiffs' Motions *in limine*.

11
12        I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

13
14        Dated this 4th day of January, 2013 at Seattle, Washington

15                                      /s/ Kyle C. Olive                      
                                       KYLE C. OLIVE

16
17
18
19
20
21
22
23
24
25

**OLIVE|BEARB & GRELISH PLLC**
1218 3rd Ave, Suite 1000
Seattle, WA 98101
T: (206) 629-9909
F: (206) 971-5081

# Exhibit 1

1

2

3

4

5

6

7

8 UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
9 AT SEATTLE

10 HOSSEIN TAVAKOLI and      No. 2:11-cv-01587-RAJ
POURANDOK SHAHNIAN, a married
11 couple, and the marital community      DEFENDANT'S DISCLOSURE OF
composed thereof,      EXPERT WITNESSES

12

     Plaintiffs,

13

14      v.

15 ALLSTATE PROPERTY AND
CASUALTY INSURANCE COMPANY,
an Illinois Company Doing Business in
16 the State of Washington,

17      Defendant.

18

19      Pursuant to Fed. R. Civ. P. 26(a)(2), Defendant Allstate Property and

20 Casualty Insurance Company ("Allstate") hereby discloses that it may call the

21 following witness at trial to present rebuttal expert testimony and evidence under

22 Federal Rule of Evidence 702, 703, or 705 as described in the attached report,

23 including in rebuttal to the opinions disclosed by John Fountaine on August 1,

24 2012 and based on information in documents produced by Plaintiffs for the first

25 time on August 17, 2012.

26

DEFENDANT'S DISCLOSURE OF EXPERT WITNESS      Riddell Williams P.S.
(CASE NO. 2:11-CV-01587-RAJ) - 1      1001 FOURTH AVENUE PLAZA
4826-5170-9200.01      SUITE 4500
SEATTLE, WA 98154-1192
(206) 624-3600

1    In addition to any previously disclosed case-in-chief and rebuttal experts,

2    whose testimony may also be offered in rebuttal, to the extent appropriate, Allstate

3    also discloses:

4        William Partin CPA/ABV
         Mueller & Partin, PS, Inc.
5        Washington Federal Center
         400 108th Avenue N.E., Suite 615
6        Bellevue, WA 98004
         425-455-0303
7        partin@muellerpartin.com

8        A report from Mr. Partin is attached hereto as Exhibit A.

9

10   DATED this 27th day of August, 2012.

11                           RIDDELL WILLIAMS P.S.

12

13                           By s/ Gavin W. Skok
                                 Gavin W. Skok, WSBA #29766
14                               gskok@riddellwilliams.com

15

16                           By s/ Gregory T. Euteneier
                                 Gregory T. Euteneier, WSBA #42069
17                               geuteneier@riddellwilliams.com

18                               Attorneys for Defendant
                                 Allstate Property and Casualty Insurance
19                               Company

20                               RIDDELL WILLIAMS P.S.
                                 1001 Fourth Avenue, Suite 4500
21                               Seattle, WA 98154-1192
                                 Telephone: (206) 624-3600
22                               Facsimile: (206) 389-1708

23

24

25

26

DEFENDANT'S DISCLOSURE OF EXPERT WITNESS
(CASE NO. 2:11-CV-01587-RAJ) - 2
4826-5170-9200.01

Riddell Williams P.S.
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA 98154-1192
(206) 624-3600

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the date written below, a true and correct copy of the foregoing document, **DEFENDANT'S DISCLOSURE OF EXPERT WITNESS** was served on the following attorneys, by the means indicated:

| Service List | |
|---|---|
| Kyle C. Olive (WSBA #35552)<br>Timothy A. Bearb (WSBA #39300)<br>Joseph W. Moore, Jr. (WSBA #44061)<br>Olive Bearb PLLC<br>1218 3rd Avenue, Suite 100<br>Seattle, WA 98101<br>Tel: 206-629-9909<br>Fax: 206-971-5081<br>Email: kyle@olivebearb.com<br>Email: timothy@olivebearb.com<br>Email: joseph@olivebearb.com<br>*Attorneys for Plaintiffs* | ☐ U.S. Mail<br>☐ By Facsimile<br>☐ By Messenger<br>☐ By Federal Express<br>☐ Via CM/ECF<br>☒ Via Email |
| Leonard Semenea, WSBA #35327<br>10845 Main Street<br>Bellevue, WA 98004<br>Tel: 425 688 1108<br>Fax: 425 688 1106<br>Email: drls67@msn.com<br>    semenealaw@gmail.com<br>*Attorneys for Plaintiffs* | ☐ U.S. Mail<br>☐ By Facsimile<br>☐ By Messenger<br>☐ By Federal Express<br>☐ Via CM/ECF<br>☒ Via Email |

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct and that this declaration was executed on the 27th day of August, 2012, at Seattle, Washington.

_____
Jan Sherred

DEFENDANT'S DISCLOSURE OF EXPERT WITNESS
(CASE NO. 2:11-CV-01587-RAJ) - 3
4826-5170-9200.01

# Exhibit 2

## MUELLER· & PARTIN, PS, INC.

WASHINGTON FEDERAL CENTER
400 108ᵗʰ AVENUE N.E., SUITE 615
BELLEVUE, WASHINGTON 98004

**Certified Public Accountants**
**Forensic Economists**

PHONE:      (425) 455-0303
FACSIMILE:   (425) 455-5176
EMAIL:partin@muellerpartin.com

*Gary E Mueller - Retired

August 27, 2012

Mr. Gavin Skok
Riddell Williams, PS
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192

Re:   *Tavakoli v. Allstate Property and Casualty Insurance Company*

Dear Mr. Skok,

In accordance with the terms of our engagement, this report summarizes our evaluation of the income loss claim asserted by Hossein Tavakoli in connection with a motor vehicle accident that occurred on October 9, 2007.

## BACKGROUND

The claim arises from an October 9, 2007 motor vehicle accident. Mr. Tavakoli alleges that injuries sustained in the accident significantly decreased his ability to perform certain job functions as a restaurant manager/owner, resulting in a loss of business income and ultimately causing he and his wife to sell the business in March, 2011. Mr. Tavakoli owned and operated Saffron Kabobs (SK), a small Persian restaurant with his wife Pourandokht Shahniani, at the time of the incident. He is married, has two dependent children, and resides in Issaquah, Washington. Mr. Tavakoli was 47.54 years of age on the date of the subject accident.

## SCOPE

Mueller & Partin, Certified Public Accountants and Forensic Economists, has been engaged by Riddell Williams, PS to evaluate the income loss claim asserted by Hossein Tavakoli resulting from the October 9, 2007 motor vehicle accident. We have also been asked to prepare a report summarizing our findings and conclusions. Our work on this project included analysis of the following information:

- Plaintiff's Deposition Testimony, dated July 31, 2012,

- Deposition Testimony of Pourandokht Shahniani, dated July 31, 2012,

- First Amended Complaint for Damages, dated September 22, 2011,

- Responses, Supplemental Responses, and Second Supplemental Responses to Allstate Property and Casualty Insurance Company's First Interrogatories and Requests for Production, dated July 25, 2012, August 1, 2012, and August 3, 2012,

- Plaintiffs' Initial Disclosures and Second Supplemental Initial Disclosures, dated November 22, 2011 and August 7, 2012,

- Form 1040 Income Tax Returns for Hossein Tavakoli and Pourandokht Shahniani for the years 2005 through 2011,

- Saffron Kabobs' Quarterly and Annual Profit and Loss Statements for the period 2007 through March 31, 2011,

- Saffron Kabobs' Balance Sheets as of December 31, 2007, December 31, 2008, December 31, 2009, December 31, 2010, and March 31, 2011,

- Saffron Kabobs' General Ledger as of March 31, 2012,

- Theodore Becker, Ph.D.'s Performance Based Physical Capacity Evaluation, dated July 25, 2012,

- Vocational Report of John Fountaine, dated August 2, 2012.

We relied upon the accuracy of the information provided. We performed analytical procedures considered appropriate under the circumstances to evaluate the loss claimed. Our procedures were performed exclusively for the purpose of evaluating the income loss claim asserted by Mr. Tavakoli resulting from the subject incident. This report is intended solely for your use in connection with the above-referenced litigation matter and should not be used for any other purpose.

The opinions expressed in this report are stated on a more probable than not basis. Our engagement was conducted in accordance with practice and ethical standards established by the American Institute of Certified Public Accountants for consulting services. A copy of my curriculum vitae, list of cases where I have provided sworn testimony, list of

publications I have authored and my firm's billing rate sheet are included as Attachment 11 to this report.

## ANALYSIS

### Earnings History

We summarized Mr. Tavakoli's historical earnings on Attachments 3 through 7. As stated above, Mr. Tavakoli owned and operated SK with his wife at the time of the accident. SK was originally registered with the Washington State Department of Revenue on February 23, 2006. We understand that prior to owning SK, Mr. Tavakoli primarily held minimum wage jobs in the service industry from 1980 to 2000.[1] We further understand he was unemployed for a period of almost two years during 2002 and 2003, held employment with Top Foods as a front-end cashier for three or four years, was a maintenance worker sometime during 2005, and subsequently obtained employment as a real estate agent from 2005 to 2006.[2] We note that Mr. Tavakoli's highest year of earnings were in 2006, when he was working as a real estate agent. He ended his real estate career to own and operate SK.

Mr. Tavakoli returned to full time work at SK the day following the subject accident[3] and continued in that capacity until both he and Ms. Shahniani elected to sell the business in March of 2011 for $25,000, approximately 3.5 years after the accident.[4] We understand Mr. Tavakoli was employed as a car salesman for Evergreen Ford for a short period of time during 2011 and subsequently obtained employment at Toyota of Seattle in a similar position[5] by November, 2011.[6] Mr. Tavakoli indicated in his deposition that he is currently working 50 – 55 hours per week and earning the greater of either minimum wage or the commissions generated each month.[7] No current earnings information has been produced.

### Business Income Loss Claim

Mr. Tavakoli asserts that injuries sustained in the accident limited his ability to perform duties as a co-owner owner/operator of SK, resulting in a loss of business income. SK's revenues and expenses, according to its tax returns, are summarized on Attachment 6. Analysis of revenues indicates the following:

---

[1] Deposition Testimony of Hossein Tavakoli, dated July 31, 2012 (pp. 16).
[2] Deposition Testimony of Hossein Tavakoli, dated July 31, 2012 (pp. 17 - 18, 35 - 36).
[3] Deposition Testimony of Hossein Tavakoli, dated July 31, 2012 (pp. 49).
[4] Deposition Testimony of Hossein Tavakoli, dated July 31, 2012 (pp. 26).
[5] Deposition Testimony of Hossein Tavakoli, dated July 31, 2012 (pp. 40 - 41).
[6] Source: Theodore Becker, Ph.D.'s Performance Based Physical Capacity Evaluation, dated July 25, 2012 (pp. 3).
[7] Deposition Testimony of Hossein Tavakoli, dated July 31, 2012 (pp. 41, 43).

| Year | Total Revenues |
|------|----------------|
| 2006 | $27,594 |
| 2007 | $187,852 |
| 2008 | $216,788 |
| 2009 | $191,771 |
| 2010 | $183,577 |
| 2011 | $44,096 |

The above analysis indicates that SK's revenues actually increased after the accident as compared to the year of the accident. The analysis further indicates that revenues remained within the same general range of SK's pre-accident sales during 2009 and 2010, despite the recession. SK's net profits followed a similar trend (Attachment 6); net profits were higher in the year following the accident as compared to the year of the accident and remained within the pre-accident range during 2009 and 2010.

We analyzed SK's quarterly revenues to determine if the subject accident had any impact on Mr. Tavakoli's earnings immediately following the accident (refer to Attachment 7). Analysis of quarterly revenues before and after the accident indicates the following:

| Quarter | Revenues |
|---------|----------|
| 1st - 2007 | $53,497 |
| 2nd - 2007 | $54,102 |
| 3rd - 2007 | $38,112 |
| 4th - 2007 | $42,502 |
| 1st - 2008 | $59,555 |
| 2nd - 2008 | $60,439 |
| 3rd - 2008 | $55,029 |
| 4th - 2008 | $44,782 |
| 1st - 2009 | $55,278 |
| 2nd - 2009 | $47,556 |
| 3rd - 2009 | $39,006 |
| 4th - 2009 | $49,931 |

The analysis indicates that SK's revenues varied somewhat from quarter to quarter. We note that revenues dropped below the normal range of variation in the quarter immediately prior to the accident (3rd Quarter 2007). Revenues were higher during each of the three quarters following the accident as compared to the three quarters immediately before the accident.

We analyzed SK's quarterly revenues, expenses and profits on Attachment 7. SK's net profits declined during the two quarters following the accident; however, the decline is attributable to accounting entries for depreciation, amortization, automobile expense, taxes and other expenses that are unrelated to labor, food cost, sales or other factors that could be impacted by an injury to the owner of the business. If one were to remove these non-performance related expenses from the profit and loss statements, SK's net profits immediately following the accident would roughly equate to the level of profits generated immediately before the accident.

There was a slight quarterly increase in salaries and wage expense after the accident during 2008 and 2009 as compared to the three quarters in 2007 before the accident. The increase corresponds to an increase in sales during the same time period. Salary and wage expense dropped below pre-accident levels by 2010 as sales declined. There is no evidence that the small increase in salary and wage expense (approximately $12,000 over the two year period) was related to any reason other than the increase in revenues during the same time period.

We accordingly determined that the subject accident did not measurably impact SK's sales or its profitability. There is accordingly no basis for a claim of lost earnings attributable to SK operations.

<u>Loss of Business Opportunity Claim</u>

Mr. Tavakoli asserts the accident forced him and his wife to sell SK in March of 2011. When specifically asked about why he sold SK Mr. Tavakoli stated the following in his deposition:

> *"Q: Let's go back to when you opened Saffron Kabobs. Did you own the space it was in, or was that spaced leased?*
>
> *A: Leased.*
>
> *Q: Who did you lease it from?*
>
> *A: From Cornell Quality Construction Company.*
>
> *Q: How long was that lease for?*
>
> *A: For five years.*

*Q: So it expired in 2011?*

*A: Yes.*

*Q: Was there a renewal provision in that lease?*

*A: Yes.*

*Q: What were the terms of that renewal provision?*

*A: We could negotiate the terms.*

*Q: No set price for renewal in the lease?*

*A: Not that I remember, No.*

*Q: Did you attempt to negotiate renewal – renewal of your lease in 2011 with Cornell Quality Construction?*

*A: Yes.*

*Q: What was Cornell's position?*

*A: You mean --*

*Q: Did they want a higher lease rate than Saffron Kabobs had previously been paying?*

*A: They wanted to raise the rent.*

*Q: How much did they want to raise the rent?*

*A: They indicated they wanted to raise the rent and it wasn't just. It wasn't fine with us. So we didn't get to the exact, you know, figures. It was just trying to be reasonable at times like that. That's not a good time to raise the rent."*[8]

*"Q: Did Cornell at any point tell you how long you could stay on a month-to-month lease?*

---

[8] Source: Deposition Testimony of Hossein Tavakoli, dated July 31, 2012 (pp. 21 – 22).

*A: He indicated that – not for too long.*

*Q: Did he ever give you a firm deadline?*

*A: No.*

*Q: How did this all – ultimately resolve? Did you enter a new lease with Cornell?*

*A: No.*

*Q: Why not?*

*A: He indicated that some people were interested in – in buying the restaurant.*

*Q: Is that the Thai food restaurant that's there now?*

*A: Yes. No. No. It was our – Thai food restaurant – it was our, you know – the buyer that we found ourselves; so we sold it. We --.*

*Q: You sold Saffron Kabobs?*

*A: Yes. "[9]*

Mr. Tavakoli's testimony accordingly indicates that SK was sold for reasons unrelated to the subject accident. Mr. Tavakoli was not willing to pay more rent and SK was unable to afford to pay any increased rent without further reducing the limited amount of compensation it produced for its owners. Mr. Tavakoli was in a situation where he had three alternatives:

- Agree to higher rent and accept less compensation for he and his wife, further exacerbating their financial situation,

- Let the lease expire, allowing the leasehold improvements to revert to the landlord, realizing no compensation for his investment in SK assets,

- Sell the restaurant and realize some recovery of his initial investment.

---

[9] Source: Deposition Testimony of Hossein Tavakoli, dated July 31, 2012 (pp. 25 – 26).

Mr. Tavakoli chose to sell the restaurant because it was his best option. Profits generated by the restaurant resulted in less than a minimum wage income for Mr. Tavakoli and his wife. His best option was to sell the restaurant and obtain employment elsewhere.

Financial Condition

Our analysis of the records produced indicates that Mr. Tavakoli and Ms. Shahniani started having financial problems before the subject accident. Attachment 2 summarizes Mr. Tavakoli and Ms. Shahniani's annual expenditures as reported on their income tax returns. The analysis appears to indicate that Mr. Tavakoli elected to take a home equity line of credit to finance the purchase of SK sometime during 2006 (their home mortgage interest deduction increased from $11,045 in 2005 to $22,143 in 2006), which significantly increased their annual expenditures from 2006 through 2010. Attachment 1 compares expenditures deducted on their tax returns to the total household income generated. The analysis indicates that Mr. Tavakoli and Ms. Shahniani's income available for normal living expenses (such as food, utilities, clothes, etc.) steadily declined from $16,436 in the year before the accident to $(8,847) in the year following the accident. Mr. Tavakoli and Ms. Shahniani were not generating enough income from SK to support the needs of their family. They could obtain work in any variety of low paying occupations and earn more than they were earning from SK. The lack of earnings sufficient to pay for normal living expenses both before and after the accident was the probable motivation for selling SK in March of 2011 and likely resulted in the loss of their primary residence to foreclosure[10]. We accordingly determined that the subject accident had no impact on Mr. Tavakoli's decision to sell SK in March of 2011 or the foreclosure on his home.

Critique of John Fountaine Report

John Fountaine's report dated August 2, 2012 concluded that Mr. Tavakoli incurred an economic loss ranging between $250,000 and $500,000 resulting from the accident. We disagree with Mr. Fountaine's conclusions for the following reasons:

- Mr. Fountaine assumed that Mr. Tavakoli's pre-injury earning capacity is best represented by the average wages of restaurant managers ($77,592 per year) in Washington. Analysis of Mr. Tavakoli and Ms. Shahniani's actual pre-incident earnings as shown on Attachment 3 indicates that their combined earnings were never more than $55,889 in any year and that their earnings varied from year to year. There is no evidence that Mr. Tavakoli ever earned more than a minimum wage (or near

---

[10] Source: Vocational Report of John Fountaine, dated August 2, 2012 (pp. 2).

minimum wage) income while working in the restaurant industry. There is no evidence Mr. Tavakoli had the skills or experience to obtain a position as a restaurant manager earning over $77,000 per year. Mr. Fountaine accordingly based his economic loss calculations on unsupported speculative assumptions resulting in a material overstatement of any loss.

We note that a similar approach to claimed loss of earning capacity was attempted in a lawsuit tried in the United States District Court Western District of Washington before Judge Zilly.[11] Judge Zilly ruled "The Court finds that the plaintiff's actual past earnings is the best evidence of this plaintiff's actual wage earning capacity as of the accident." There accordingly appears to be no legal or factual basis for Mr. Fountaine's assumptions.

- Mr. Fountaine apparently failed to analyze SK's income tax returns both before and after the accident. As discussed above, SK's revenues and net profits were actually higher following the accident as compared to before the accident, indicating Mr. Tavakoli's accident related injuries did not negatively impact the profitability of the business. There accordingly appears to be no objective evidence that would substantiate any economic loss, let alone the amounts calculated in Mr. Fountaine's report.

- Mr. Fountain apparently failed to research Mr. Tavakoli's entire earning history while living in the United States. Mr. Tavakoli's deposition testimony describes a history of low paying work in jobs paying at or near minimum wage. There is no evidence that Mr. Tavakoli was suddenly capable of transforming from low skilled positions to a management position paying in excess of $77,000 per year. Operation of a small ethnic specialty restaurant with less than one full time equivalent employee and approximately $200,000 per year in sales does not qualify Mr. Tavakoli to manage a full service restaurant. At best, he would be qualified as a first line supervisor of food preparation and service workers, which pays an average wage of $35,830 per year as published by WOIS (based on State of Washington Employment Security Department data). Mr. Fountain's overstatement of Mr. Tavakoli's earning capacity results in a material overstatement of any loss.

- Mr. Fountain failed to compare Mr. Tavakoli's pre-accident earning history with earnings in mitigating occupations that continue to be available to him. For example, Mr. Tavakoli is currently employed as a car salesperson. Payscale.com indicates the median compensation paid to automotive retail salespersons in Bellevue Washington is $34,969 per year, with a $48,000 wage paid to experienced salespersons. The

---

[11] Alan R. Cooper v. Trident Seafoods Corporation (C-02-621Z)

earnings in his present career exceed those generated prior to the accident in every year except 2006 when he was working as a real estate agent at the peak of the real estate market.

There is no evidence indicating Mr. Tavakoli could not return to work as a realtor. He has prior experience in the occupation and his post accident work history indicates that he is capable of performing the work. The current median average earnings of real estate agents in the State of Washington are $34,215 per year and $56,401 per year for experienced agents (according to WOIS). Mr. Tavakoli could return to work as a real estate agent and earn as much as his best year of documented pre-accident earnings.

Mr. Tavakoli's residual earning capacity is equivalent to his pre-accident earning capacity. There is accordingly no basis for any earnings loss.

- Mr. Fountaine appears to have failed to consider the impact of Mr. Tavakoli's bladder cancer in his pre-incident earning capacity calculations. The records indicate that Mr. Tavakoli was diagnosed with bladder cancer in June of 2012. Mr. Tavakoli will likely have to miss extended periods of time from work for various cancer-related treatments such as chemotherapy, radiation therapy, and potential surgeries[12]. Survival rates for advanced stages of bladder cancer are low and it is possible Mr. Tavakoli may die from the disease, resulting in a significant reduction in his remaining worklife. It is also possible that treatment of the disease may eliminate Mr. Tavakoli's ability to work in a restaurant or any job on a full time basis. Mr. Fountaine's failure to consider Mr. Tavakoli's bladder cancer and its probable impact on his future earnings results in a material overstatement of the alleged loss.

- Mr. Fountaine made no effort to allocate income generated by SK between Mr. Tavakoli and his wife. Both spouses worked at least a full time schedule at the restaurant and each was responsible for a portion of its earnings. Mr. Fountaine made no apparent effort to segregate the duties performed or the value of those duties between the two spouses. He made no apparent attempt to identify the number of hours each spouse worked in the business. Deposition testimony of the plaintiffs indicates that the spouses were both working more than full time and shared job duties at SK. Therefore, SK's earnings should be allocated on an approximate 50/50 basis. Had a proper allocation of earnings and assessment of hours worked been made between the spouses, Mr. Fountaine would have concluded that Mr. Tavakoli's earnings were less than minimum wage at SK, both before and after the accident. Mr. Tavakoli's demonstrated earning capacity as a restaurant owner is accordingly

---

[12] We note that Mr. Tavakoli was scheduled to have surgery for his bladder cancer on August 7, 2012 (refer to Theodore Becker, Ph.D.'s Performance Based Physical Capacity Evaluation, dated July 25, 2012 (pp. 2)).

substantially less than the $77,592 pre-accident earning capacity assumed by Mr. Fountaine. Mr. Fountaine's assumption regarding future earning capacity is inconsistent with Mr. Tavakoli's demonstrated earning capacity and results in a material overstatement of any loss.

- We disagree with the 17.46 year worklife estimate utilized in Mr. Fountaine's calculation. Mr. Fountaine arbitrarily assumes that Mr. Tavakoli would have worked continuously with no breaks in employment until the age of 65 (or March 25, 2025). Bureau of Labor Statistics data indicates that similarly situated males do not work continuously through age 65, but rather, participate in the labor force for 15.14 years before permanently retiring. According to the Bureau of Labor Statistics data, 47.54 year old males with some college education have an expected remaining worklife of 15.14 years, not 17.46 as assumed by Mr. Fountaine. Mr. Fountaine's worklife assumption overstates Mr. Tavakoli's worklife expectancy by approximately 2.32 years.

- Mr. Fountaine apparently did not consider the probability of future periods of unemployment in Mr. Tavakoli's worklife. Worklife estimates measure participation in the labor force; participation is defined as either working or unemployed but looking for work. Therefore, when worklife tables are used to determine the number of years of future labor force participation, estimates of earnings throughout an individual's worklife must accordingly be adjusted for the probability of unemployment. In the United States the average unemployment rate for the last ten years was 6.5% as shown on Attachment 9. Mr. Fountaine's projected estimate of income loss is accordingly overstated because he failed to reduce future earnings losses by the probability of unemployment.

- Mr. Fountaine's calculations failed to discount future economic damages into present value dollars. In order to prepare an accurate estimate of the present value of a future stream of earnings, it is necessary to consider the rate of return a sum of money received as settlement for damages could be invested at that would fully replace the value of any economic benefits lost in future years. We note that an appropriate discount rate based on the historical yield of ten-year U.S. government securities would be 3.95% as shown on Attachment 10. Mr. Fountaine's failure to discount Mr. Tavakoli's projected future earnings to present value dollars results in a material overstatement of the loss.

## CONCLUSION

We analyzed the documents produced to date to evaluate the alleged income loss incurred by Hossein Tavakoli associated with an October 9, 2007 motor vehicle accident. Mr.

Tavakoli continued to work on a steady basis after the accident with no documented time off for recovery. Analysis of salary and wage information produced for SK to date indicates no replacement employees were hired. Analysis of SK revenues indicates that they increased after the accident. There is accordingly no evidence that the accident had a measureable negative impact on SK profits. Mr. Tavakoli and Ms. Shahniani elected to sell Saffron Kabobs for reasons unrelated to the accident. Its earnings were not sufficient to meet its owners' standard of living requirements. The restaurant was ultimately sold as are many similar small family operated food service businesses that are incapable of producing a living wage.

Mr. Tavakoli has demonstrated that he has residual earning capacity that is equivalent to his pre-accident earning capacity. There is accordingly no objective basis for any claim of lost past or future income.

We note that discovery is ongoing in this matter and reserve the right to supplement our report with any changes to our conclusions once additional information is produced.

Very truly yours,

William Partin CPA/ABV

# Exhibit 3

# MUELLER· & PARTIN, PS, INC.

**Certified Public Accountants**
**Forensic Economists**

FIRST MUTUAL CENTER
400 108ᵗʰ AVENUE N.E., SUITE 615
BELLEVUE, WASHINGTON 98004

*Gary E. Mueller - Retired

PHONE:       (425) 455-0303
FACSIMILE:   (425) 455-5176
EMAIL: partin@muellerpartin.com

## WILLIAM E. PARTIN CPA/ABV

Partner
Certified Public Accountant
Accredited In Business Valuation

## EXPERIENCE:

October 1, 1984
to Present

Mr. Partin formed the consulting and accounting firm of Mueller & Partin as a Partner on October 1, 1984. Mueller & Partin is a firm specializing in economic analysis, financial investigations and business valuations. Mr. Partin is the principal of the firm, supervises all engagements, and provides expert testimony as required. Mr. Partin also serves as an appraiser and umpire in insurance disputes and as an arbitrator in commercial litigation involving complex financial and economic issues. Mr. Partin has been engaged as an expert to analyze over 3,000 damage claims over the past 30 years and has testified as an expert witness at trial in excess of 150 occasions over the course of his career. Mr. Partin has extensive experience with the following types of analysis:

- Business Valuations
- Patent Infringement
- Copyright/Trademark Infringement
- Breach of Contract
- Business Income Losses
- Construction Defect Claims
- Land Use/Permit Claims
- Construction Delay and Impact Analysis
- Property Losses
- Personal Injury
- Fidelity

- Contract Surety
- Proof of Economic Motive
- RICO Investigations
- Antitrust

Mr. Partin has served as an expert witness and appraiser in a variety of situations involving tracing financial transactions, documentation of illegal income, and the valuation of businesses, property, and future earnings potential.

**August 1976 to**
**October 1984**

Laventhol & Horwath, Certified Public Accountants

Mr. Partin was the Manager and Department Head of the firm's Northwest Division of Management Advisory Services. As a consultant with an international firm, Mr. Partin's diversified experience included:

- Accounting problems in specialized areas,

- Valuation of income producing properties,

- Valuation of business enterprises for mergers and acquisitions,

- Financial projections for businesses in various industries,

- Market supply and demand analysis,

- Feasibility studies for large scale real estate developments,

- Analysis, evaluation and interpretation of the effect of business transactions and decisions as an expert witness in litigation matters ranging from major antitrust issues to small civil matters,

- Evaluation of organization structures and implementation of recommended structural reorganization in a variety of businesses in different industries.

**June 1973 to**
**August 1976**

Weyerhaeuser Company, Wood Products Division
At Weyerhaeuser, Mr. Partin was a participant in its Management Development Program. He held various management positions in operations at lumber and plywood manufacturing facilities.

## GENERAL:

Mr. Partin has served as guest speaker for a variety of professional associations, addressing topics covering insurance claims, business valuation, income loss measurement and proof of damages in a litigation setting. In addition, he has contributed to the following publications:

- Insurance Adjuster Magazine

- Seattle Claim Adjusters Newsletter

- Tacoma/Pierce County Claims Adjusters Newsletters

Mr. Partin was appointed to a three-year term to serve on the American Institute of Certified Public Accountant's Management Advisory Services Practice Standards and Administration Committee. The committee is responsible for the establishment of quality standards for consulting engagements. Such standards govern the practice of the accounting profession.

## EDUCATION:

Washington State University
Bachelor of Arts, Major Economics, Minor Finance

Seattle University
Graduate studies in finance, accounting and economics

## CERTIFICATION:

Certified Public Accountant

American Society of Appraisers: Business Valuation Levels 1, 2, 3 & 4

Accredited in Business Valuation by the American Institute of Certified Public Accountants

## **ORGANIZATIONS:**

Washington Society of Certified Public Accountants

American Institute of Certified Public Accountants

National Association of Forensic Economists

American Society of Appraisers

# MUELLER· & PARTIN, PS, INC.

**Certified Public Accountants**
**Forensic Economists**

FIRST MUTUAL CENTER
400 108th AVENUE N.E., SUITE 615
BELLEVUE, WASHINGTON 98004

*Gary E Mueller - Retired

PHONE:     (425) 455-0303
FACSIMILE:   (425) 455-5176
EMAIL:partin@muellerpartin.com

William E. Partin C.P.A. is a partner in the accounting firm of Mueller & Partin Certified Public Accountants where his practice is the economic analysis of damage claims in disputes involving personal injury, wrongful death, business income losses and business valuations. Mr. Partin is a member of the American Institute of Certified Public Accountants, the National Association of Forensic Economists, the Washington Society of Certified Public Accountants and the American Society of Appraisers. Mr. Partin has been qualified as an expert witness in the fields of economics, business valuation and accounting. He has testified in numerous states regarding damage measurement issues. Mr. Partin has provided seminars to the insurance industry on measurement of economic damages as well as published articles concerning the framework for the measurement of business income losses. He received his B.B.A. degree from Washington State University and has been practicing since 1976.

# MUELLER· & PARTIN, PS, INC.

**FIRST MUTUAL CENTER**
400 108th AVENUE N.E., SUITE 615
BELLEVUE, WASHINGTON 98004

**Certified Public Accountants**
**Forensic Economists**

PHONE:      (425) 455-0303
FACSIMILE:   (425) 455-5176
EMAIL:partin@muellerpartin.com

*Gary E. Mueller - Retired

**Publications of William E. Partin:**

As a member of the MAS Practice Standards and Administration Subcommittee of the American Society of Certified Public Accountants, Mr. Partin was co-author of the following publications:

*"Comparing Attest and Management Advisory Services: A Guide For The Practitioner"*. *A Management Advisory Services Special Report* - American Institute of Certified Public Accountants, 1988.

*"Written Communication Of Results In MAS Engagements"*. *Management Advisory Services Practice Aids (3)* - American Institute of Certified Public Accountants, 1987.

*"Starting And Developing an MAS Practice"*. *Management Advisory Services Practice Aids (4)* - American Institute of Certified Public Accountants, 1988.

*"Communicating With Clients About MAS Engagement Understandings"*. *Management Advisory Services Practice Aids (5)* - American Institute of Certified Public Accountants, 1988.

Mr. Partin authored a series of articles published in *Insurance Adjuster* magazine, 1986. These articles dealt with measurement of business income losses.

Mr. Partin has also authored materials for numerous continuing education programs regarding business income loss and wrongful death loss measurement.

*"Wrongful Death : Consideration for the Computation of Economic Damages"* 1996. – Mueller & Partin, LLP, CPA's

# Exhibit 4



**VOCATIONAL SYSTEMS, INC.**

August 2, 2012

Joseph W. Moore
Olive Bearb PLLC
1218 Third Ave., Ste. 1000
Seattle, WA 98101-3290

Re:     Hossein Tavakoli
DOB:  March 25, 1960
DOI:   October 9, 2007

Dear Mr. Moore:

Thank you for referring Hossein Tavakoli for a vocational assessment and recommendations. Mr. Tavakoli was interviewed and tested in my Bothell Office on July 12, 2012. In performing my work, I have reviewed records from Richard Seroussi, M.D., State of Washington Police Traffic Collision Report, King County Medical Incident Report Form, Tri-Med Ambulance Records, Valley Medical Center, Bellevue Chiropractic Group, Consolidated Imaging, Stan Schiff, M.D., Ph.D., Puget Sound Hearing & Balance, Piyale Comert, Ph.D., Seattle Spine & Sports Medicine, Group Health and a Physical Capacities Evaluation completed by Theodore J. Becker, Ph.D., RPT.

It is not my intention to restate these records in their entirety for the purposes of this report. The medical records describe multiple injuries Mr. Tavakoli sustained in a motor vehicle accident, which occurred on October 9, 2007. Mr. Tavakoli sustained injuries to his head, neck, back and knee in this accident. He received chiropractic treatment and massage with little relief. He continues to experience pain in his knee, low back, mid back, neck and shoulders.

Mr. Tavakoli began treating with Dr. Schiff a few months after his accident, due to ongoing pain, dizziness and headaches. Dr. Schiff diagnosed post-traumatic headaches; cervical, thoracic and lumbar strain and sprain, as well as a closed head injury with persistent tennitis and dizziness occasionally.

√ Main Office (Bothell) • 10132 N.E. 185th
Bothell, WA 98011 • (425) 486-4040
Fax: (425) 486-8701

Burlington Office ⌐ 160 Cascade Pl. Suite 204
Burlington, WA 98233 • (360) 424-6239
Fax: (360) 738-9524

Olympia Office ⌐ 2101 4ᵗʰ Ave Suite 101
Olympia, WA 98506 • (360) 352-5078
Fax: (360) 352-5417

Wenatchee Office ⌐ 7 N. Wenatchee Ave Suite 402
Wenatchee, WA 98801 • (509) 665-8382
Fax: (509) 665-8389

Edmonds Office ⌐ 7500 212ᵗʰ St. S.W., Suite 216
Edmonds, WA 98026 • (425) 672-9600
Fax: (425) 776-5375

Burien Office ⌐ 601 SW 152ⁿᵈ St
Burien, WA 98166• (206) 243-1300
Fax: (206) 243-0366

Kingston Office • 26121 Calvary Lane Suite 250 ⌐
Kingston, WA 98346 • (360) 633-4252

Moses Lake Of ⌐ffice • 406 W. Broadway, Suite G
Moses Lake, WA 98837 • (509) 766-0379
Fax: (509) 765-1392

Bellingham Office ⌐ 119 N. Commercial, Suite 350
Bellingham, WA 98225 • (360) 734-9163
Fax: (360) 738-9524

Tacoma Office ⌐ 2607 Bridgeport Way W. #2i
Tacoma, WA 98466 • (253) 779-5485
Fax: (253) 779-5486

Spokane Office • 1814 N. Normandie ⌐
Spokane, WA 99205 • (509) 325-7766
Fax: (509) 325-7666

Aberdeen Office ⌐ 101 E. Market St. Ste 520A
Aberdeen, WA 98520 • (360) 637-4024
Fax: (360) 352-5417

Mr. Tavakoli participated in a neuropsychological evaluation with Piyale Comert in March of 2009. Dr. Comert's impressions included decreased speed of information processing, insufficiency in attention and concentration, difficulty in complex problem solving and significant levels of depression and anxiety.

Dr. Seroussi has diagnosed post-concussive syndrome with higher level cognitive deficits, post-traumatic dizziness, dysphoria secondary to chronic pain, cervical injury, post-traumatic headaches, lumbar injury, central mediated and mild facial components with pain and decreased functional status with decreased vocational potential. In terms of his ability to work, Dr. Seroussi noted, "He likely needs to transition to work that is not as physically arduous as managing and running a restaurant. This may be difficult, given cultural and language barriers, lack of transferable work skills and his current status of self-employment. He likely would benefit from ergonomic interventions at his work-site and within his home as well, and an ergonomic evaluation would be helpful for this purpose."

In terms of his prognosis, Dr. Seroussi felt that Mr. Tavakoli had reached maximum medical improvement and would likely benefit from light duty work on a long term basis.

Dr. Becker completed a Performance Based Physical Capacities Evaluation of Mr. Tavakoli in July of 2012. Dr. Becker's evaluation reflected a tolerance for work at the light, to light plus level of work, according to the <u>Dictionary of Occupational Titles</u> (DOT). Limitations were noted in trunk flexion, kneeling, squatting, crawling, stair step functions, as well as reaching.

## INTERVIEW:

I had the opportunity to interview Mr. Tavakoli in my Bothell Office on July 12, 2012. He was 52 years old at the time of our interview. Mr. Tavakoli described injuries he sustained in a motor vehicle accident, which occurred on October 9, 2007. He received chiropractic treatment and massage, a variety of diagnostics and completed vistublar rehabilitation. At the time of our interview, he continued with home exercise. He was taking Advil and Aleve for his ongoing pain, as well as an anti-depressant for his decreased mood and depression. Mr. Tavakoli described constant pain in his low back and neck. He continues to experience headaches on a frequent basis. He experiences pain in his left knee, which includes swelling. He continues to experience dizziness and balance problems. He has fallen.

From a cognitive standpoint, Mr. Tavakoli continues with memory difficulties and he finds this frustrating. He is currently working as a car salesman and has had difficulty remembering customer names, orders and specific information. He believes this has resulted in a loss of sales.

Mr. Tavakoli described a poor sleeping pattern; he sleeps approximately 3-4 hours per night. His sleep is interrupted by pain and anxiety. He is frequently fatigued.

Mr. Tavakoli also described a very poor financial situation as a result of his motor vehicle accident and limited ability to work. His house is currently in foreclosure. He noted, "We are living day-by-day."

Mr. Tavakoli also described a decrease in his avocational activities. He enjoyed the restaurant work he performed in the past and found that to be very social; he is no longer able to perform that work and finds that he is less comfortable in social situations. Prior to his injury, he enjoyed golfing and bowling, but continues to be limited in those activities.

## EDUCATION/WORK HISTORY:

Mr. Tavakoli received his GED in the 1980's, after moving to the United States from Iran. He attended community college in the 1980's, but received no degree or certificate.

In October of 2011, Mr. Tavakoli obtained employment as a car salesman at Toyota of Seattle. He sells both new and used cars. He earns $10 per hour, with additional commission for car sales. He has only exceeded his $10 an hour rate in one month since obtaining this employment. He works approximately 55 hours per week.

From approximately 2005 to 2011, Mr. Tavakoli owned and operated Kabob's Restaurant. He performed all aspects of restaurant work and supervised 1-3 employees. He worked 10-12 hour days. Mr. Tavakoli sold his restaurant in 2011.

From approximately 2003 to 2005, Mr. Tavakoli worked for Executive Real Estate as a real estate salesperson. He left this job to go to open his restaurant.

Mr. Tavakoli also worked as a clerk and cashier at Top Foods in Bellevue from 2003 to 2005; he held his jobs at Top Foods and Executive Real Estate concurrently.

Prior to 2003, Mr. Tavakoli worked in a variety of stores and restaurants.

## ASSESSMENT:

Hossein Tavakoli is currently 52 years old. The medical records describe a complicated combination of both physical and cognitive impairments related to a motor vehicle accident, which occurred on October 9, 2007. Both the evaluations of Dr. Seroussi and Dr. Becker indicate that Mr. Tavakoli will be limited to light work in the light physical demand category and Dr. Comert's neuropsychological evaluation identifies decreased speed and information processing, decreased attention and concentration skills, difficulties in complex problem-solving, as well as depression and anxiety. Mr. Tavakoli also continues to experience headaches, dizziness, chronic pain and poor balance.

Dr. Seroussi has indicated that Mr. Tavakoli is no longer physically able to perform his past work as a restaurant manager. Work as a restaurant manager requires working long hours and performing medium physical demands (lifting up to 50 lbs. on an occasional basis). Restaurant managers typically perform many of the work duties of the restaurant staff during times of absenteeism.

Mr. Tavakoli has been extremely well motivated in his attempts to continue working. He eventually sold his restaurant in 2011. In October of 2011, Mr. Tavakoli obtained employment as a car salesman. He has not sold enough cars over the past year to allow him to receive commissions and he is currently earning $10 per hour. He exceeded his $10 an hour base in only one month since he has been hired. He works approximately 55 hours per week and describes physical and cognitive limitations in his ability to work. His chronic pain affects his ability to walk for long periods of time and his ongoing cognitive deficits decrease his effectiveness in his interactions with customers.

While Mr. Tavakoli has been extremely well motivated in both his attempts to continue to own and operate his restaurant and in his transition to car sales work, it is clear that his ongoing physical and cognitive limitations impair his ability to work.

According to the <u>Washington Occupational Information Systems</u> (WOIS), restaurant managers in Washington earn a medium wage of $37.31 per hour, or an annual wage of $77,592. This is likely a good representation of Mr. Tavakoli's pre-injury wage earning capacity, absent his impairments.

Working as a new and used car salesman, Mr. Tavakoli is currently earning approximately $10 per hour, with some commissions, when he exceeds his $10 per hour base salary. He has only exceeded this base salary in one month since obtaining his current job. Mr. Tavakoli is currently earning less than half of an average restaurant manager's earns in Washington State.

It is clear, prior to his injury, that Mr. Tavakoli had both the physical capacities and cognitive abilities to work successfully as a restaurant manager. The physical limitations and cognitive limitations described in the medical records will no longer allow Mr. Tavakoli to work effectively as a restaurant manager. As a result, he has suffered a permanent reduction in his future wage earning capacity. Given his cognitive deficits, Mr. Tavakoli would be expected to have a very difficult time completing additional education. He continues to have difficulty with memory, concentration, multi-tasking and problem solving. He also continues with difficulties related to headaches, balance and fatigue. It has been noted that he has reached maximum medical improvement and his condition is not expected to improve.

I would expect Mr. Tavakoli to continue to experience a reduction in his pre-injury wage earning capacity in the range of 25%-50%, conservatively, over his existing work life expectancy. Assuming Mr. Tavakoli will work until age 65, he has 13 years of remaining work life expectancy. At a 25%-50% reduction in his pre-injury wage earning capacity, Mr. Tavakoli will lose wages in the future in the range of $250,000 to $500,000 over his remaining work life expectancy.

Should you have any questions or require additional information, please contact me.

Very truly yours,

John Fountaine, MA, CRC, CCM
Rehabilitation Counselor/ Case Manager

JF:ajp

# Exhibit 5

### JOHN D. FOUNTAINE, M.A., C.R.C., C.C.M

OSC Vocational Systems, Inc.
10132 N.E. 185th Street
Bothell, WA 98011
Telephone: (425) 486-4040 x5223  Fax: (425) 486-8701
john@osc-voc.com

## EDUCATION

University of Northern Colorado, Greeley, Colorado, **Master's of Arts in Vocational Rehabilitation Counseling**, 1992

University of Northern Colorado, Greeley, Colorado, **Bachelor of Science in Human Rehabilitative Services**, 1991

Department of Human Resources Departmental Scholar Award recipient, 1991

## CERTIFICATIONS

**Certified Rehabilitation Counselor (C.R.C. #20725)**, Commission on Rehabilitation Counselor Certification, Martingale, Illinois

**Certified Case Manager (C.C.M. #031550)**, Commission for Case Manager Certification, Martingale, Illinois

**Vocational Expert for the Social Security Administration (BPA #0230)**, Seattle, Washington

**Registered Vocational Rehabilitation Counselor with Washington State Department of Labor and Industries,(VRC #8602)**, Olympia, Washington

**Registered Vocational Rehabilitation Counselor with the State of Alaska Department of Labor, Workers' Compensation Division**, Anchorage, Alaska

**Certified Vocational Rehabilitation Counselor with the Oregon Workers' Compensation Division (Certification #AJ0538)**

**Registered Vocational Rehabilitation Counselor with the Department of Veterans Affairs** (Certification #346-465), Seattle, Washington

## EMPLOYMENT HISTORY

**4/94 - Present:**   OSC Vocational Systems, Inc., Bothell, Washington

**Rehabilitation Counselor/Case Manager**
* Provide vocational rehabilitation services as a subcontractor for Washington State Department of Labor & Industries and the State of Alaska Department of Workers Compensation, including case management, vocational assessment, vocational rehabilitation plan development, implementation and monitoring.
* Provide vocational rehabilitation services as a contract counselor for the Department of Veteran's Affairs, evaluating employment potential, independent living support, and service needs, for veterans with service-connected disabilities.
* Provide vocational assessments, recommendations and testimony for private attorneys in civil litigation cases in Washington State, California, Oregon, Alaska, and Hawaii.
* Provide expert opinion and testimony for the Social Security Administration Office of Hearings and Appeals in Washington State and Oregon.
* Complete specialized vocational research, including labor market access to local, state and national labor market information and assess injury impact on wage earning capacity.
* Administer and interpret psychometric testing materials.
* Assist clients with job development, resume preparation and placement.
* Life Care Planning.
* Case Management Services.

**Rehabilitation Counselor/Case Manager/Branch Manager, Skagit and Whatcom Counties: 4/94 - 4/98**

* Provide vocational rehabilitation services as a subcontractor for Washington State Department of Labor & Industries and the State of Alaska Department of Workers Compensation, including case management, vocational assessment, vocational rehabilitation plan development, implementation and monitoring.
* Provide vocational rehabilitation services as a contract counselor for the Department of Veteran's Affairs, evaluating employment potential, independent living support, and service needs, for veterans with service-connected disabilities.
* Provide vocational rehabilitation services for the Office of the City Attorney, City of Bellingham, Bellingham, Washington.
* Provide vocational assessments and recommendations for private attorneys in civil litigation cases in Washington State, Alaska, and Hawaii.
* Provide vocational expert opinions in civil litigations, arbitrations, and mediations.
* Provide vocational expert opinions for the Social Security Administration's Office of Hearings and Appeals Washington and Oregon, Washington State Board of Industrial Appeals, Washington State Court, and U.S. District Court in Seattle, WA, and Honolulu, Hawaii.
* Complete specialized vocational research, including labor market access to local, state and national labor market information and assess loss of wage earning capacity.
* Advise, coordinate and direct activities of Vocational Rehabilitation Counselors and Job Developers.
* Administer and interpret psychometric testing materials.
* Assist with job development, resume preparation and client placement.

**2/93 - 4/94:**  Vocational Consulting, Inc., Tacoma, Washington

**Vocational Rehabilitation Counselor**
* Provided vocational rehabilitation services as a subcontractor for the Washington State Department of Labor & Industries.
* Evaluated qualifications for employability of injured worker and implementation of rehabilitation plans.
* Administered and interpreted psychometric testing materials.
* Assisted clients in job development, resume preparation and client placement.
* Completed specialized vocational research, including labor market access to local state and national labor market information and assessed loss of wage earning capacity.
* Assisted in the supervision of vocational rehabilitation counselor interns.

**5/92 - 8/92:**  Center for Technical Assistance in Training, Greeley, Colorado

**Research Assistant - Master's Internship in Vocational Rehabilitation Counseling**
* Designed and implemented a community-based research study on disabled clients' satisfaction with employment.
* Implemented survey design, performed client interviews, analyzed research data, and completed written reports.

**5/91 - 12/91:**  Schaffer Rehabilitation Center, Greeley, Colorado.

**Case Manager, Job Coach and Trainer - Internship for Bachelor of Science degree in Human Rehabilitation Services**
* Provided vocational rehabilitation counseling and job coaching to persons with severe disabilities.
* Duties included: skill development and client placement, psychometric testing, development of vocational rehabilitation plans, systematic instruction and evaluation, as well as training and supervision of job coaches.

## PERTINENT CONTINUING EDUCATION / PUBLICATIONS

Fountaine J., et al; (Presenter) American Rehabilitation Economics Association (AREA) Conference, **Determining the Reasonableness of Past Medical Bills, and Case Manager/Life Care Plan Interactive with Economist**, Santa Barbara, CA, 9/30/11.

Fountaine, J., et al; (Presenter) American Rehabilitation Economics Association (AREA) Annual Conference 2011, **Determining the Reasonableness of Past Medical Bills**, Seattle, WA, 6/9/11.

Guest lecturer, Seattle University School of Law - Forensics class, **Vocational Rehabilitation, Case Management and Life Care Planning Expert Testimony**, Sullivan Hall - Room 101, April, 2011, Seattle, Washington.

Fountaine, J., et al: Past Medical Bill Review: Who is Best Qualified to Determine the Reasonableness of Costs?, Trial News, September 2010.

Guest lecturer, Seattle University School of Law - Forensics class, **Vocational Rehabilitation, Case Management and Life Care Planning Expert Testimony**, Sullivan Hall - Room 101, April, 2010, Seattle, Washington.

Speaker, **Preconference Thinking Outside the Box: Anatomy of a Case and Special Considerations, Part 3 of 3**, International Association of Rehabilitation Professionals (IARP) Conference October 29, 2009, Memphis, Tennessee.

Fountaine J., et al, (2009), **Bereavement and Mortality: A Methodology for Assessing Capacity and Functioning Following the Loss of a Spouse**, Journal of Life Care Planning, Vol. 7, No. 4, 163-179. Athens, GA: Elliott & Fitzpatrick, Inc.

Speaker, **"Worklife Expectancy and Life Expectancy Data, Methodology and Thinking Outside the Box – Effects on Earning Capacity Assessments and Life Care Plans,"** International Association of Rehabilitation Professionals (IARP), October 30, 2008, Weston Florida.

Fountaine, J. et al, (2008), Contributor to the **CDMS Study Guide, 5th Edition**. Athens, GA: Elliott & Fitzpatrick, Inc.

Fountaine, J. et al, (2007), Contributor to the Workers' Compensation Update. Eau Claire, WI, Lorman Education Services.

Fountaine, J. et al, (2007), **Rules of Evidence vs. Professional Certifications: The Real Basis for Establishing Admissible Testimony by Rehabilitation Counselors and Case Managers**. The Rehabilitation Professional, Vol. 15, No. 4, 7-16. Athens, GA: Elliott & Fitzpatrick, Inc.

Speaker, **"Earning Capacity Data, Methodology and Thinking Outside the Box,"** International Association of Rehabilitation Professionals (IARP), 2007 National Conference, November 1, 2007, Las Vegas, Nevada.

Speaker, **"Applied Methodology in Vocational Rehabilitation,"** International Association of Rehabilitation Professionals (IARP), 2006 Washington Chapter Conference, September 30, 2006, Tacoma, Washington.

**"Conference for Advanced Studies in Forensic Rehabilitation,"** International Association of Rehabilitation Professionals (IARP), January 23-27, 2006, Montego Bay, Jamaica.

Fountaine, J. (2006). Contributor to **Methods and Protocols, Meeting the Criteria of General Acceptance and Peer Review Under Daubert and Kumho**. Athens, GA: Elliott & Fitzpatrick, Inc.

Fountaine, J. (2005). Contributor to The Quick Desk Reference for **Forensic Rehabilitation Consultants**. Athens, GA: Elliott & Fitzpatrick, Inc.

Speaker, **"Successful Handling Of Wrongful Death Cases in Washington,"** Lorman Educational Services, March 22, 2005, Seattle, Washington.

Speaker, **"Life Care Planning in Washington,"** Lorman Educational Services, October 14, 2004, Seattle, Washington.

## PERTINENT CONTINUING EDUCATION / PUBLICATIONS (cont.)

Fountaine, J. et al, (2004), **The Efficacy of Professional Clinical Judgment: Developing Expert Testimony in Cases Involving Vocational Rehabilitation and Care Planning Issues,** Journal of Life Care Planning, Vol. 3, No. 3, 131-150. Athens, GA: Elliott & Fitzpatrick, Inc.

Speaker, Rehabilitation Association of Montana (R.A.M.), 2004 Spring Conference, April 29-30, Missoula, Montana.

Fountaine, J. & Petgrave, C., (2004), **Book Review,** Wolfesberger, W., The Future of Children with Significant Impairments: What Parents Fear and Want, and What They and Others May Be Able to Do About It, Journal of Life Care Planning, Vol. 3, No. 1, 55-56. Athens, GA: Elliott & Fitzpatrick, Inc.

Fountaine, J. (2002). Contributor to **Approaches to estimating lost earnings: Strategies for the rehabilitation consultant.** Athens, GA: Elliott & Fitzpatrick, Inc.

Fountaine, J.(2001). Contributor to **Comprehensive Study Guide for the examinations of Certification of Disability Management Specialist (CDMS), Case Manager Certification (CCM), Certified Life Care Planner (CLCP).** Athens, GA: Elliott & Fitzpatrick, Inc.

**Issues in Forensic Rehabilitation,** Elliott & Fitzpatrick, Inc., September 28 & 29, 2000, New Orleans, LA.

**Vocational Rehabilitation and Counseling Contractor Training,** U.S. Department of Veterans Affairs, Vocational Rehabilitation Division, Seattle Washington, October, 1999

Speaker, **"Understanding Brain Injury,"** Washington State Convention and Trade Center, May 14, 1999, Seattle, Washington.

**Case Management By The Year 2000,** Western Regional Case Managers Meeting, May 1-3, 1998, Palm Springs, California.

Speaker, **"Emerging Vocational and Economic Issues in Legal Assessments,"** Whatcom County Bar Association, February 5, 1997, Bellingham, Washington.

**"Getting Started as a Vocational Expert,"** National Association of Rehabilitation Professionals in the Private Sector, Forensic Section Seminar, July 12-13, 1996, Snowbird Ski & Summer Resort, Salt Lake City, Utah.

**"Sailing Into the Future,"** Pacific Regional Conference sponsored by National Rehabilitation Association, June 6-8, 1996, Honolulu, Hawaii.

**"Moving Outside Your Comfort Zone,"** Vocational Expert Witness Seminar sponsored by National Association of Service Providers in Private Rehabilitation and National Rehabilitation Counseling Association, March 30, 1996, Tacoma, Washington.

**"Supervising in the Field of Vocational Rehabilitation,"** sponsored by National Association of Rehabilitation Professionals in the Private Sector, March 22 and 23, 1996, Tukwila, Washington.

**"The Use, Questioning, and Testimony of Vocational Experts,"** sponsored by Social Security Administration Office of Hearings and Appeals, October 20, 1995, Seattle, Washington.

**"Contractor Training,"** sponsored by Department of Veterans Affairs, Vocational Rehabilitation & Counseling Services, September 26, 1995, Seattle, Washington.

**"Job Modification Technology Fair,"** sponsored by Washington State Department of Labor and Industries, September 18, 1995, Olympia, Washington.

**"Contracted Provider Training,"** sponsored by Washington State Department of Labor and Industries, July 28, 1995, Olympia, Washington.

## AFFILIATIONS

International Academy of Life Care Planners (IALCP)

International Association of Rehabilitation Professionals (IARP)

National Rehabilitation Association (NRA)

National Rehabilitation Counseling Association (NRCA)

Faculty Member, **Lorman Education Services**

Editorial Board Member, **Forensic Rehabilitation and Economics – A Journal of Debate and Discussion**

# Exhibit 6

771 F.Supp.2d 1253
United States District Court,
W.D. Washington,
at Tacoma.

The NORTHWESTERN MUTUAL
LIFE INSURANCE COMPANY,
a foreign corporation, Plaintiff,

v.

Richard L. KOCH, an individual, Defendant.

No. C08–5394BHS. | Nov. 9, 2009.

## Synopsis

**Background:** Insurer brought action against insured seeking declaratory judgment that it was entitled to rescind certain insurance contracts that it issued to insured. Insured counterclaimed that insurer violated the Washington Insurance Fair Conduct Act (IFCA) by unreasonably denying insurance coverage for a disability insurance policy. Insured moved for trial by jury on the issue of punitive damages.

**[Holding:]** As matter of first impression, the District Court, Benjamin H. Settle, J., held that insured had right to jury trial on punitive damages counterclaim.

Motion granted.

## Attorneys and Law Firms

**\*1254** James R. Hermsen, James E. Howard, Dorsey & Whitney LLP, Seattle, WA, for Plaintiff.

Kenneth R. Friedman, Friedman Rubin & White, Bremerton, WA, for Defendant.

## Opinion

### ORDER GRANTING DEFENDANT'S MOTION FOR TRIAL BY JURY ON THE ISSUE OF PUNITIVE DAMAGES

BENJAMIN H. SETTLE, District Judge.

This matter comes before the Court on Defendant's Motion for Trial by Jury on the Issue of Punitive Damages. Dkt. 26.

The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file and hereby grants the motion for the reasons stated herein.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On June 23, 2008, Plaintiff filed a complaint against Defendant seeking declaratory judgment that it was entitled to rescind certain insurance contracts that it issued to Defendant. Dkt. 1. Defendant counterclaimed that, among other things, Plaintiff violated the Washington Insurance Fair Conduct Act ("IFCA"), RCW 48.30.015. Dkt. 6 ¶¶ 43–45. On August 18, 2009, Defendant filed a Motion for Trial by Jury on the Issue of Punitive Damages. Dkt. 26. On September 8, 2009, Plaintiff responded. Dkt. 30. On September 11, 2009, Defendant replied. Dkt. 31.

It is undisputed that the Court has jurisdiction over this matter based on diversity of citizenship pursuant to 28 U.S.C. § 1332. The current issue before the Court arises out of Defendant's claim that Plaintiff violated IFCA by unreasonably denying insurance coverage for the disability insurance policy D1039334. In pertinent part, IFCA provides as follows:

(1) Any first party claimant to a policy of insurance who is unreasonably denied a claim for coverage or payment of benefits by an insurer may bring an action in the superior court of this state to recover the actual damages sustained, together with the costs of the action, including reasonable attorneys' fees and litigation costs, as set forth in subsection (3) of this section.

(2) The superior court may, after finding that an insurer has acted unreasonably in denying a claim for coverage or payment of benefits or has violated a rule in subsection (5) of this section, increase the total award of damages to **\*1255** an amount not to exceed three times the actual damages.

RCW 48.30.015. Defendant requests a ruling that he is entitled to a jury on RCW 48.30.015(2).

A more complete factual and procedural background is contained in the Court's order of partial summary judgment. Dkt. 48.

## II. DISCUSSION

In 2007, the Washington Legislature enacted RCW 48.30.015(2) allowing insureds, in certain circumstances, a right to increased "damages." The statute provides that the "court may" increase the damages. Neither party disputes that the statute directs the judge to determine the amount, if any, of increased damages. The Court agrees with this interpretation. Thus, if this action were tried in state court, the instant issue would be moot. The question before the court, however, is whether, under the Seventh Amendment, an insured has a right to a jury on the issue of increased damages when a claim under RCW 48.30.015 is brought in federal court. The Court is unaware of any binding or persuasive precedent resolving an apparent inconsistency between the Washington statute and the Seventh Amendment.

[1] Because the Court's jurisdiction in this action is based on complete diversity, the Court must engage in a three-part choice-of-law analysis to determine whether Defendant is entitled to a jury. *Hanna v. Plumer,* 380 U.S. 460, 470–74, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). If there is a valid Federal Rule of Procedure on point, then the court must follow federal law. *Id.* at 473–474, 85 S.Ct. 1136 ("To hold that a Federal Rule of Civil Procedure must cease to function whenever it alters the mode of enforcing state-created rights would be to disembowel either the Constitution's grant of power over federal procedure or Congress' attempt to exercise that power in the Enabling Act.").

[2] If there is no direct conflict, the Court must follow the *Erie* doctrine and apply state law on substantive issues and federal law on procedural issues. *Id.* at 468, 85 S.Ct. 1136 (citing *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). The Court's review of the substantive or procedural nature of the state law in question must be informed by "the twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws." *Id.* Finally, the Court must consider whether an overriding federal interest requires application of federal law despite the substantive nature of the state law in question. *See Byrd v. Blue Ridge Rural Elec. Coop.,* 356 U.S. 525, 537–39, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958).

In this case, Defendant argues that Fed.R.Civ.P. 39 is "on point." Dkt. 31 at 3. Rule 39 provides that "[w]hen a jury trial has been demanded under Rule 38, ... trial on all issues

so demanded must be by jury unless ... the court, on motion or on its own, finds that on some or all of those issues there is no federal right to a jury trial." Rule 38 provides that the "right of trial by jury as declared by the Seventh Amendment to the Constitution ... is preserved to the parties inviolate." The Court agrees that Rule 39 is "on point" if the Seventh Amendment provides the individual right to a trial by jury on the issue punitive damages.

The Seventh Amendment provides as follows:

> In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

**\*1256** U.S. Const. amend VII. The Court is unaware of any Supreme Court or Ninth Circuit case that directly holds that the "right to jury" clause of the Seventh Amendment includes the issue of punitive damages. In fact, the Supreme Court has stated that the "Seventh Amendment is silent on the question whether a jury must determine the remedy in a trial in which it must determine liability." *Tull v. United States,* 481 U.S. 412, 425–426, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987). The Court also stated that "[n]othing in the Amendment's language suggests that the right to a jury trial extends to the remedy phase of a civil trial." *Id.* at 426, n. 9, 107 S.Ct. 1831.

There is, however, a separate line of cases on the scope of the Seventh Amendment. The Third Circuit, in interpreting an almost identical Pennsylvania statute, found "*Tull*" inapposite" to the question of whether the Seventh Amendment provides a right to a jury trial on the issue of punitive damages. *Klinger v. State Farm Mut. Auto. Ins. Co.,* 115 F.3d 230, 235–236 (3rd Cir.1997). The court reasoned that

the appropriate precedent is [*Curtis v. Loether,* 415 U.S. 189, 192, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974) ], in which the Court held that a "damages action under [42 U.S.C. § 3612] ... is analogous to a number of tort actions recognized at common law. More important, the relief sought here-actual and punitive damages-is the traditional relief offered in the courts of law." *Id.* at 195–96, 94 S.Ct. 1005. Thus, we conclude that the punitive damages remedy in a statutory bad faith action under [the Pennsylvania statute] triggers the Seventh Amendment jury trial right, a result consistent

with several [Pennsylvania district court] cases that have decided the issue.

*Klinger,* 115 F.3d at 236.

**[3]** In this case, the Court finds that the *Klinger* reasoning is persuasive because the Supreme Court has recognized that "punitive damages" are a type of "traditional relief offered in the courts of law." *Curtis,* 415 U.S. at 195, 94 S.Ct. 1005. The Seventh Amendment preserved the right to a jury on these traditional types of relief. *Id.* at 195–196, 94 S.Ct. 1005.

**[4]** Plaintiff, however, contends that the Seventh Amendment is not implicated because increased damages under RCW 48.30.015(2) are not "punitive" damages. Dkt. 30 at 10. This argument is not persuasive. While it is true that there is no common law right to punitive damages in Washington, *see, e.g., Dailey v. North Coast Life Ins. Co.,* 129 Wash.2d 572, 575, 919 P.2d 589 (1996), the Washington Supreme Court's "long-standing rule prohibit[s] punitive damages *without express legislative authorization.*" *Id.* (emphasis added). By enacting RCW 48.30.015(2), the Washington legislature expressly authorized an award of up to three times actual damages. Moreover, the *Dailey* court recognized that the "increased damages" language contained in a different statute was an explicit authorization of punitive damages. *Dailey,* 129 Wash.2d at 577, 919 P.2d 589 (citing RCW 19.86.090 ("the court may, in its discretion, increase the award of damages up to an amount not to exceed three times the actual damages sustained")). Therefore, the Court finds that RCW 48.30.015(2) is an express authorization of punitive damages.

Because the Seventh Amendment provides that a party in federal court is entitled to a jury on the issue of punitive damages, Federal Rules of Civil Procedure 38 and 39 are on point for the issue of whether Defendant is entitled to a jury on his claim for increased damages under RCW 48.30.015(2). If there is a valid Federal Rule of Procedure on point, then the court must follow federal law. *Hanna,* 380 U.S. at 473–474, 85 S.Ct. 1136. The Court **\*1257** is bound by the Federal Rules of Procedure and need not consider the remaining elements of the choice of law analysis.

### III. ORDER

Therefore, it is hereby

**ORDERED** that Defendant's Motion for Trial by Jury on the Issue of Punitive Damages (Dkt. 26) is **GRANTED.**

---

End of Document

© 2013 Thomson Reuters. No claim to original U.S. Government Works.